# Southeastern Research Laboratories, Inc.

**Dr. Richard W. Henderson**
President

PO Box 12368 • Florence, SC 29504-2368
(843) 667-6929 • Fax (843) 667-6939

July 29, 2010

Sean F.W. Keenan, Esq.
Cruser & Mitchell, LLP
275 Scientific Drive, Suite 2000
Norcross, GA 30092

Reference: Amber Wright v. Farouk
D/I: 2-11-05

Dear Mr. Keenan:

At your request, I reviewed the following documents in connection with the above-referenced incident:

Material Safety Data Sheets for: CHI Blondest Blonde Powder Lightener; CHI Color Generator – 40 Volume; Sodium Metasilicate, Anhydrous; Metso Beads 2048 Sodium Metasilicate; Potassium Persulfate; Bentolite H; Casein; DL-Panthenol; Magnesium Hydroxide; Titanium Dioxide; Remyflo S 200; Microwhite 100; Basic Blue 54; Versene 220 Crystals Chelating Agent – EDTA; UCARE Polymer JR-30M; C.I. Pigment Violet 23; Crosilk Powder; Structure ZEA; C7106 Ultramarine Blue; Olive Oil; and Drakeol LT Mineral Oil; Handbook of Chemistry and Physics; Batch Master for CHI Lightening Powder (Blondest Blonde), 6-4-08; Batch Master for CHI Lightening Powder (Blondest Blonde), 11-16-04; Batch Master for CHI Lightening Powder (Blondest Blonde), 11-17-04; Deposition of Maria Shenker, taken April 26, 2007; Photographs of Amber Wright; Deposition of Sergio Castillo, taken July 22, 2008; Deposition of Farouk Shami, taken July 1, 2009; Deposition of Mikko Horttana, taken February 19, 2009; Expert Report of Mort Westman, Hudson v. Shear Magic; Expert Report of Mort Westman, Wright v. Farouk; Expert Report of Mort Westman, Huynh v. Hughes; Expert Report of Mort Westman, Happy v. Olson; Deposition of Mort Westman, Hudson v. Shear Magic, taken September 23, 2008; Deposition of Mort Westman, Wright v. Farouk, taken June 24, 2010; Report of Chemical Analyses by Gayle O'Neill, dated 8-22-08; Defendant's Responses to Plaintiff's First Interrogatories; CHI Blondest Blonde Ionic Lightening System information sheet; CHI Blondest Blonde Ionic Powder Lightener label; Report by Dr. Robert Feinstein, dated June 21, 2010; Deposition of Shaukat Gulamani, taken July 23, 2008; Medical Reports; Label for CHI 40 Volume Color Generator; Recall Notice; Black/white photographs; Affidavit of Nick Robinette, dated July 5, 2006; Deposition of Amber Wright, taken March 16, 2010; Procedure for the chemical analysis of powder bleach for active oxygen; information about Mort Westman.

EXHIBIT A

In addition, I have reviewed the processes utilized by Farouk to manufacture CHI Blondest Blonde Ionic Powder Lightener, and to test the product.

1. On February 11, 2005, Amber Wright went to Vicki O's hair salon in Carrollton, Georgia, to have her hair lightened and cut. Monica Shenker, a licensed cosmetologist, was her stylist. Ms. Shenker has a Master of Cosmetology degree, and has attended annual continuing education classes dealing with hair cosmetology, including training in cutting, coloring, permanents, and other hair styling procedures. She was licensed in 2001, and has been actively engaged in hair styling since then.

2. Ms. Shenker mixed CHI Blondest Blonde Ionic Powder Lightener and 40 volume CHI Color Generator, forming a slurry, which was used to lighten Amber's hair. She had performed the lightening procedure on Amber's hair using the same product one time previously without incident. Ms. Shenker separated the hair sections that were to be lightened, placed foils (each about 2½" by 3") under them, applied the lightener mixture to the hair sections, and then folded the foils closed. She arranged the foils in a halo pattern, starting above the ears and going over the crown of the head. Once that process was completed, she put Amber under the hair dryer, which she turned to a low-medium setting, and then went to the break room.

3. About four minutes later, another stylist, Judy Eady, came and told her that Amber said that her head was hot. Ms. Shenker took the foils out, and shampooed, conditioned and rinsed Amber's hair. Amber stated that there were three areas that were tender. Ms. Shenker and Kim Rampey inspected the areas, but they did not observe anything unusual; specifically, they did not observe any burns to the scalp. Amber's scalp did have the pink coloration that is associated with the use of hair dryers. The three areas where Amber complained of tenderness were on her forehead, about four inches above her left ear, and toward the base of her head. Ms. Shenker applied aloe to those areas, and Amber left. Amber's hair was not fully lightened, as it was exposed to the process for only about four minutes, rather than the required 12-15 minutes. The next day Ms. Shenker called the Wright home, and was told by Amber's mother, Lisa Wright, that Amber was okay.

4. Some five days later Amber returned to the salon with her mother, and Ms. Shenker observed a small cut on Amber's forehead, but no indications of any burned areas on her scalp.

5. On February 20, 2005, Amber was taken to the Emergency Room at Tanner Medical Center; she had complained of burning in her scalp for two days. A 2.5 cm section of her scalp was found to have second and third degree burns, with concomitant hair loss.

6. Mr. Mort Westman reviewed this incident and concluded that the injury to Amber's scalp occurred during the lightening procedure on February 11, and that it resulted from either a chemical incident, in which the lightening chemicals contacted the scalp, or a thermal incident, in which the chemicals in the foils became quite hot, causing the scalp damage either by radiant energy or by hot gases escaping the foils. He concluded that there was an elevation in temperature due to the presence in the Blondest Blonde Lightener of a "high concentration of actives … homogenously present throughout the product," or "in localized areas of inordinately high reactivity (i.e., hotspots)." Mr. Westman has asserted that there are various ways in which these hypothesized aberrant compositions could be present in the Blondest Blonde Ionic Powder Lightener, including:

   a. Incomplete mixing of batches of the product, in which there are pockets with abnormally-high concentrations of active ingredients.

   b. The presence of a component that contains a heavy metal catalyst (e.g., a pigment), which results in elevated temperatures.

   c. "Clinging" (agglomeration) of the active ingredients.

   d. Differential settling, in which the active ingredients separate from the other ingredients.

In order to assess Mr. Westman's assertions, it is instructive to review the composition of Blondest Blonde Ionic Powder Lightener, its reaction with Color Generator, and how it is manufactured and tested.

7. Blondest Blonde Ionic Powder Lightener consists of a number of ingredients. The two that account for its activity in lightening hair (that is, removing the color from the hair), are sodium metasilicate (SM) and potassium persulfate (PP). The SM provides alkalinity (pH above 7) necessary to activate the reaction, and the PP provides oxygen for the process. There are various other ingredients present, including components such as carriers (help with the transfer of the lightener), emulsifiers (act to keep the ingredients distributed uniformly), conditioning agents (help prevent damage to the hair), and a chelating agent (acts to scavenge or trap metal ions to stabilize the product). The ingredients have similar particle sizes. The product also contains dye material, giving it a distinctive blue coloration. Blondest Blonde Ionic Powder Lightener has ingredients that potentially can react with each other; however, because the product is in a powder form, the reaction rate is so slow as to be negligible. Reactions proceed much more quickly when

the ingredients are in a liquid form. To start the reaction process, Blondest Blonde powder is mixed with CHI Color Generator, which has a liquid base, and the reaction proceeds. The maximum temperature rise during the lightening process is only a few degrees above ambient.

8. There are various steps involved in producing Blondest Blonde Ionic Powder Lightener, and there are quality assurance/control procedures in place to confirm that the product is prepared properly. Each incoming ingredient is inspected and tested in accordance with the Certificate of Analysis provided by the manufacturer. In addition, prior to its use in the production of a batch of Blondest Blonde Ionic Powder Lightener, each ingredient is once again inspected and verified. The ingredients are introduced into a mixing drum that is dedicated to the production of Blondest Blonde Ionic Powder Lightener, with a supervisor monitoring the manufacturing process. The drum is equipped with a series of rotating mixing arms, where the ingredients are stirred thoroughly for two hours. After the ingredients are mixed, samples are collected from each batch and subjected to quality control tests to assure that the batch meets the quality specifications. Before filling of the containers begins, the containers, labels and boxes are verified by the Quality Assurance Department, which also confirms the lot information and product specifications with the Quality Control Laboratory. Once this confirmation has been received, the Laboratory signs off on a laboratory inspection sample sticker. The last step in the quality control procedure involves testing of samples of the finished product from each batch. This testing includes: Appearance; Performance Testing with Hair Swatches (including lightening and damage to the hair); pH; Viscosity; and Odor. In addition, in some cases, a Forearm Test is conducted. The results of these tests are recorded on the Batch Master sheet that identifies each batch that is produced. Once it has been confirmed that a batch of Blondest Blonde Ionic Powder Lightener meets these manufacturing specifications, the Quality Control Laboratory issues an "Approved" sticker. After the testing of the finished product is complete, it is passed through a sieve, and then introduced into the individual containers. In all the quality control testing of the literally hundreds of batches prepared, there have never been any reports of any unevenly-distributed ingredients, or clumps, or that there were any "hotspots" present.

9. With respect to the CHI Color Generator, after production, the product is tested by the Quality Control Laboratory for: Appearance; Peroxide Concentration; pH; and Viscosity. Once it is confirmed that the product meets the manufacturing specification, the Quality Control Laboratory issues an "Approved" sticker.

10. I have observed the procedure used to produce the batches of Blondest Blonde Ionic Powder Lightener, and have inspected the product in different areas of the drum after the mixing process was completed. There was no evidence of a lack of homogeneity, nor any evidence that any of the product had clumped together; also, the blue color was uniform throughout the product.

11. With respect to Mr. Westman's differential settling assertion, it should be noted that there have been thousands and thousands of pounds of Blondest Blonde Ionic Powder Lightener produced, and subsequently used in millions of hair lightening procedures. If differential settling were a systemic problem, that is, the active ingredients preferentially migrated away from the other components, it would be expected that essentially every container would undergo this process, with the product in one part of the container having reduced (or no) lightening activity, while product in another part of the container would have exceptionally-high activity and would generate excessively-high temperatures. If his assertion of differential settling had any validity, it would be expected that the number of complaints about erratic lightening results would have been staggering.

12. Mr. Westman had testing conducted that is right on point with respect to the issue of differential settling. He requested that samples be taken from the tops and bottoms of containers of Blondest Blonde Ionic Powder Lightener and chemically analyzed for active oxygen and pH, two properties that monitor the presence of the active ingredients, SM and PP. If differential settling actually occurred, the sample from the top portion of a container would have different results from one taken from the bottom. However, the results for the top and bottom samples in each container were the same - that is, there was no evidence of differential settling.

13. Mr. Westman also refers to a "clinging" hypothesis, where the ingredients stick together. There is no evidence that this occurs, and even if it did, such a condition would not lead to an overheating situation. If the powder is mixed thoroughly with the Color Generator, then the performance of the slurry would be normal. If, however, the slurry was not mixed completely, there would be lessened activity (and lower temperatures produced), since the part of the product inside the clumps would not be mixed with the Color Generator. Ms. Shenker did not report observing any clumps of material in the mixing bowl or any heterogeneity of the Blondest Blonde powder or of the slurry formed by the mixture of the Blondest Blonde and the Color Generator.

14. He also asserts that heavy metals may be present in an ingredient used to produce the Blondest Blonde Ionic Powder Lightener, and that these metals might catalyze the reaction, causing extremely high temperatures. However, he cites no testing that supports this speculation. If heavy metals were present as components of an ingredient, the product from all of the batches made with that ingredient would have had the same problem – namely, the generation of excessively-high temperatures during use. There is no evidence of such thermal excursions. Also, the EDTA component present in the formulation is a scavenger for such metals, and would render them inactive and unable to catalyze reactions. With respect to the "heavy metals in a pigment" assertion, I tested the effect of greatly elevating the level of pigment in the product. It was found that the addition of an excessive level of pigment had no effect on the temperature of the slurry.

15. With respect to an injury resulting from a chemical burn from contact of the lightener mixture, Ms. Shenker stated that she observed Amber's hair and scalp after the lightening procedure, and that there was no evidence of "bleeding," that is, leaking of the lightening mixture from the foils onto the scalp. In particular, she did not observe the "leopard spots" that are characteristic of "bleeding."

16. Mr. Westman also hypothesized that Amber's injury may have resulted from thermal insult, in which the foil temperature was so elevated that radiation from the foils, or hot gases escaping from them, caused the burn. It would be expected that Ms. Shenker would mix the slurry thoroughly (as per instructions and consistent with her training), and thus all of the foils would have had the same composition of lightening agent. Accordingly, all of the foils would have been severely overheated. Since the foils were arranged in a halo pattern, it would be expected that Amber would have been burned in a halo pattern; however, this did not occur. Rather, the fact that her injury was in only one location is inconsistent with the hypothesis that the lightener in the foils overheated. In addition, had the temperature been elevated sufficiently to burn Amber's head by radiant energy or hot gases, when Ms. Shenker removed them she would have noticed that the temperatures of the foils were extremely high, since the lightener had not had sufficient time to complete the reaction. However, there was no indication from Ms. Shenker that anything unusual had occurred with the foils.

17. Thus, it is concluded that the assertion by Mr. Westman that the injury to Amber Wright's scalp resulted from the use of Blondest Blonde Ionic Powder Lightener, either by a chemical effect or by a thermal effect, does not have any merit. When he tested his hypothesis about differential settling, he found that the data were inconsistent with such a scenario. With respect to his speculation about possible improper

formulations of Blondest Blonde Ionic Powder Lightener, it should be noted that he has not reported observing such a condition in any of the Blondest Blond Ionic Powder Lightener that he has inspected, nor has any of his testing supported these assertions. Finally, like Mr. Westman, I am not aware of any papers in the literature, or other writings, that support his opinions regarding "hot spots" in the lightener.

18. My conclusions are based on the information received to date; they may be modified or changed should additional information become available.

19. A copy of my resume is attached, with publications cited; a list of trials and depositions is included as well.


_____
Dr. Richard W. Henderson
Certified Professional Chemist